UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

DAWN SCOTT EMANUEL,       :
                          :
            Plaintiff,    :          **OPINION AND ORDER**
                          :
        -against-         :          16-CV-5873 (JLC)
                          :
NANCY A. BERRYHILL,[1] Acting :
Commissioner, Social Security :
Administration,           :
                          :
            Defendant.    :

-------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge**.

Plaintiff Dawn Scott Emanuel brings this action seeking judicial review of a final decision by Defendant Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration (the "Commissioner"), denying Emanuel's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the Social Security Act. Emanuel has moved, and the Commissioner has cross-moved, for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, Emanuel's motion is denied and the Commissioner's cross-motion is granted.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Berryhill is hereby substituted for former Acting Commissioner Carolyn W. Colvin as the defendant in this action.

## I.    Background

### A.    Procedural History

Emanuel applied for DIB and SSI on March 26, 2012.  Administrative Record

("R"), dated January 17, 2017, Dkt. No. 14, at 14.  The Social Security

Administration ("SSA") denied Emanuel's application on August 7, 2012.  *Id*. at 180.

On December 19, 2012, Emanuel filed a request for reconsideration with the SSA.

*Id*. at 186.  As part of her request, Emanuel filed an appeals form on January 23,

2013.  *Id*. at 359.  On April 11, 2013, the SSA found the August 2012 denial to be

proper.  *Id*. at 187.  On May 21, 2013, Emanuel requested a hearing before an

Administrative Law Judge.  *Id*. at 197.  Represented by counsel, Emanuel appeared

before Administrative Law Judge Michael A. Rodriguez (the "ALJ") on April 8,

2014.  *Id*. at 14.  In a decision dated September 5, 2014, the ALJ found that

Emanuel was not disabled and denied her application for DIB and SSI.  *Id*.

Emanuel requested review of the ALJ's decision by the SSA Appeals Council on

November 7, 2014.  *Id*. at 9.  This request was denied on June 1, 2016, making the

ALJ's decision final.  *Id*. at 1.

Represented by different counsel, Emanuel timely filed this action on July 22,

2016, requesting judicial review of the Commissioner's decision pursuant to 42

U.S.C. § 405(g).  Complaint, Dkt. No. 1.  On November 28, 2016, the parties

consented to the undersigned's jurisdiction for all purposes under 28 U.S.C. § 636(c).

Dkt. No. 13.  The Commissioner answered and filed the Administrative Record on

January 17, 2017.  On March 14, 2017, Emanuel moved for judgment on the

pleadings, seeking reversal of the Commissioner's decision and a remand for further administrative proceedings. Amended Motion for Judgment on the Pleadings, Dkt. No. 17; Memorandum of Law in Support of Motion ("Pl. Memo"), Dkt. No. 16, at 17.[2] After requesting and receiving two extensions, the Commissioner cross-moved for judgment on the pleadings on July 26, 2017. Motion for Judgment on the Pleadings, Dkt. No. 22; Second Memorandum of Law ("Def. Memo"), dated September 13, 2017, Dkt. No. 25.[3] No reply papers have been filed.

## B.     The Administrative Record

### 1.     Emanuel's Background

Emanuel was 44 years old on the alleged disability onset date of March 14, 2012. R. at 124. When she applied for DIB and SSI, she lived in Lawrenceville, Georgia. *Id.* at 277, 284. Later that year, she moved to New York, where she had previously lived. *Id.* at 45. Emanuel has two children: a teenage daughter and an adult son. *Id.* at 47–48. Emanuel's husband had a stroke and a heart attack and now lives apart from Emanuel. *Id.* at 43–44. One of Emanuel's sisters died in 2009. *Id.* at 59, 82–83. Emanuel previously worked as a Certified Nurse Assistant ("CNA"). *Id.* at 331. Before that, Emanuel had also worked as a phlebotomist. *Id.*

---

[2] Emanuel initially filed a motion with incorrect filing and service dates. Dkt. No. 15. The Amended Motion includes correct dates.

[3] As reflected on the docket, the Clerk of the Court terminated the Commissioner's July 26, 2017 motion because of a filing error and notified the Commissioner that she should re-file her motion and memorandum of law separately. The Commissioner re-filed her motion papers on September 13. Dkt. Nos. 23–25.

On October 23, 2011, while working for Duluth Medical Services in Georgia, Emanuel injured her right shoulder. *Id.* at 52–53, 527–28. On March 26, 2012, Emanuel applied for DIB and SSI. *Id.* at 277, 284. On June 13, 2012, as part of her application, Emanuel filed a Pain Questionnaire and a Function Report. *Id.* at 339, 345. In her Pain Questionnaire, Emanuel reported "continuous, all day" pain in her right shoulder and in the back of her neck. *Id.* at 340. In her Function Report, Emanuel claimed that these pains prevented her from completing many daily activities, such as personal care, meal preparation, and getting around. *Id.* at 347–49. Also in her Function Report, Emanuel reported no difficulties managing money, paying attention, or following instructions. *Id.* at 349–51.

On October 12, 2012, about three months after her initial application was denied, Emanuel injured her head and left shoulder in an automobile accident. *Id.* at 667, 704. As part of her request for reconsideration of the initial adverse determination, Emanuel filed a form on January 23, 2013 in which she claimed that she had "increased neck pain and right shoulder pain." *Id.* at 359. Emanuel also claimed "depression and sadness" as a new mental limitation. *Id.*

### 2.     Medical Evidence in the Record

#### a.     Emanuel's Physical Conditions

##### i.     2006 Shoulder Injury

On April 25, 2006, Emanuel was involved in a car accident that caused an injury to her right shoulder and her neck. *Id.* at 442. Subsequently, on September 19, 2006, Emanuel filed for DIB and SSI. *Id.* at 103. Emanuel had two surgeries on

her right shoulder. *Id.* at 458, 466. After a hearing, an ALJ determined on January 29, 2009 that Emanuel was disabled from July 11, 2006 to July 25, 2008. *Id.* at 110.[4] Emanuel returned to work as a CNA in 2009. *Id.* at 331; s*ee also id.* at 293 (stating earnings from 2010–2012).

### ii.     2011 Shoulder Injury

As discussed, Emanuel injured her right shoulder while at work on October 23, 2011. *Id.* at 527.

### iii.     2012 Examination by Dr. Scott Barbour, MD

On March 5, 2012, Emanuel was examined by Dr. Scott Barbour, MD. *Id.* at 514–17. Emanuel complained of pain in her right shoulder following her October 2011 injury. *Id.* at 514. Dr. Barbour described Emanuel as awake, alert, and oriented to time, person, and place. *Id.* at 515. As part of his examination, Dr. Barbour reviewed a Magnetic Resonance Imaging test ("MRI") of Emanuel's cervical spine and right shoulder and also took an x-ray of her shoulder. *Id.* at 516. He diagnosed Emanuel with chronic cervical spondylosis and suggested physical therapy and possibly steroid injections. *Id.* Although the shoulder MRI was of "poor quality," Dr. Barbour believed Emanuel's right shoulder demonstrated signs of rotator cuff tendinosis, acute strain, or partial thickness rotator cuff tear. *Id.*

---

[4] The ALJ's decision states that the hearing for Emanuel's prior claim occurred on January 5, 2008. *Id.* at 103. However, the Record suggests this hearing was on a later date: the ALJ noted that the prior hearing was initially scheduled for October 25, 2008, and also that a medical improvement occurred "as of July 26, 2008, the date the claimant's disability ended." *Id.* at 110. The Court will therefore presume that the ALJ's decision contains a typographical error and the prior hearing was held on or about January 5, 2009.

The x-ray of Emanuel's shoulder revealed no fractures, dislocations, or degenerative changes. *Id.* Dr. Barbour concluded that Emanuel could return to "sedentary work with no lifting whatsoever, no activities with her right upper extremity [and] no bending, crawling, or stooping." *Id.* at 517.

### iv. 2013 examination by Dr. David Dynof, MD

On February 6, 2013, Emanuel was examined by Dr. David Dynof, MD due to persistent pain. *Id.* at 715. Upon physical examination, Dr. Dynof found severe tenderness to palpitation in the thoracic spine and tenderness to palpitation in both shoulders. *Id.* at 716. Dr. Dynof's examination also revealed impingement in both shoulders and weakness of the supraspinatus muscles in Emanuel's left shoulder. *Id.* To relieve the pain, Dr. Dynof administered trigger point injections in the cervical and thoracic spine. *Id.* at 720.

Emanuel returned for follow-up appointments in April and July of 2013. *Id.* at 745, 768. At both, she reported some relief from pain and received additional trigger point injections. *Id.* at 745–49, 768–71.

### v. 2013 Physical Therapy Treatment at Harvey Family Chiropractic

From February to August 2013, Emanuel had physical therapy appointments at Harvey Family Chiropractic several times each month. *Id.* at 724–26, 732–44, 750–66, 772–73. Her initial evaluation showed muscle spasms, tenderness, swelling/edema, and tightness in both shoulders. *Id.* at 724.

### vi.  2013 examination by Dr. David Dickoff, MD

On July 26, 2013, Emanuel was examined by Dr. David Dickoff, MD. *Id.* at 667. Upon physical examination, Dr. Dickoff concluded that Emanuel suffered from head trauma with concussion, post-concussive headaches, cervical sprain, possible cervical radiculopathy, and lumbosacral radiculopathy. *Id.* at 668. On July 31, 2013, Dr. Dickoff conducted a nerve conduction velocity and an electromyogram test, both of which demonstrated normal results. *Id.* at 664. On the basis of these results, Dr. Dickoff ruled out peripheral neuropathy, myopathy, and lumbosacral radiculopathy. *Id.* On November 22, 2013, Dr. Dickoff conducted an electroencephalography, which also returned normal results. *Id.* at 662.

### vii.  2013 examination by Dr. Shariar Sotudeh, MD

On August 29, 2013, Emanuel was examined by Dr. Shariar Sotudeh, MD. *Id.* at 660. Based on x-ray results, Dr. Sotudeh believed that Emanuel had cervical and lumbosacral spine syndrome with radiculopathy. *Id.* at 657. On October 10, 2013, Dr. Sotudeh reexamined Emanuel and reviewed her x-ray results. *Id.* at 653. Dr. Sotudeh concluded that Emanuel had cervical spondylosis and degenerative changes in her lumbosacral spine, with no significant pelvis abnormalities. *Id.*

### b.  Emanuel's Mental Conditions

#### i.  2012 Examination by Dr. Lavanya Subramanian, MD

On October 4, 2012, Emanuel was examined by Dr. Lavanya Subramanian, MD. *Id.* at 612. Emanuel complained to Dr. Subramanian of anergia, anhedonia, irritability, and frequent crying spells. *Id.* Dr. Subramanian described Emanuel as

"very hostile [and] guarded." *Id.* Dr. Subramanian recorded that Emanuel said "social services sent me here" and that the medical visit was a "waste of time." *Id.* Dr. Subramanian noted that Emanuel showed no signs of delusions or hallucinations. *Id.* at 613. Dr. Subramanian described Emanuel's thought process as "logical," her mood as "angry" and "depressed," her behavior as "aggressive" and "withdrawn," and her intelligence as "average." *Id.* at 614. Dr. Subramanian diagnosed Emanuel with "Major Depressive Disorder, Single Episode, Moderate." *Id.* at 615.

### ii. 2013 Treatment by Estefania Diaz, LMSW

On September 13, 2013, Emanuel saw Estefania Diaz, LMSW.[5] *Id.* at 678–92.[6] Emanuel reported "crying spells, poor motivation, isolation, anxiety," and "difficulty breathing when in a crowded environment." *Id.* at 678. Diaz noted that Emanuel was "uncooperative," "guarded," "suspicious," "defiant," and that she "interrupted frequently." *Id.* at 683. Emanuel was alert and oriented. *Id.* at 684. Her attention was "unremarkable" and her intellectual function was "average." *Id.* Emanuel's thought process was "coherent" and her thought content was "depressive." *Id.*

Diaz's overall impression was that Emanuel was "irritable and short fused at times," "guarded and had difficulty expressing her thoughts and [f]eelings," and was

---

[5] LMSW stands for Licensed Master Social Worker.

[6] The record reflects that Emanuel saw Diaz simply at "Andrus." *Id.* at 677–92. According to Emanuel, Andrus is a mental health clinic. Pl. Memo at 11.

preoccupied with her sister's death.  *Id.* at 685.  Diaz diagnosed Emanuel with

major depressive disorder and panic disorder.  *Id.* at 688.  Diaz attributed

Emanuel's diagnoses to "economic problems," "unresolved grief," "traumatic injury,"

and "housing problems."  *Id.* at 689–90.

> ### iii. 2014 Treatment at Westchester Jewish Community Services by Dr. Daniela Balint, MD and Marjorie Dingee, LCSWR

On March 19, 2014, Emanuel was seen at Westchester Jewish Community

Services ("WJCS") by psychiatrist Dr. Daniela Balint.  *Id.* at 787–91.  Dr. Balint

observed that Emanuel demonstrated no signs of hallucinations or delusions, that

her thought form was focused, and that her orientation, memory, and concentration

were "intact."  *Id.* at 789.  Dr. Balint found that Emanuel's insight and judgment

were "limited."  *Id.*  Dr. Balint's impression was that Emanuel presented

"depressive symptoms and anxiety in context of multiple stressors (family, financial,

health)."  *Id.*

On April 16, 2014, Emanuel saw Marjorie Dingee, LCSWR[7] at WJCS.  *Id.* at

779–86.  Dingee noted that "[Emanuel] can be very aggressive and impulsive" and

that "she talks about some mental health experiences that sound somewhat

hallucinatory in nature."  *Id.* at 780.  Dingee found that Emanuel's intellect was

"normal."  *Id.* at 782.  On a seven point scale, Dingee rated Emanuel's housing

stability a one, the lowest rating (Dingee also recorded that Emanuel lived in a

---

[7] LCSWR stands for Licensed Clinical Social Worker in Psychotherapy.

homeless shelter), her ability to manage time a four, her problem solving ability a

three, her productivity a one, and her behavior norms a two. *Id.* at 782–85.

### c. Consultative Examinations

#### i. 2013 Consultative Examination by Dr. Fredelyn Damari, PhD

On March 11, 2013, Emanuel was examined by consultative examiner Dr.

Fredelyn Damari, PhD. *Id.* at 33, 634. Dr. Damari noted that Emanuel complained

of "constant pain, insomnia, depression, and anxiety." *Id.* Dr. Damari found

Emanuel's demeanor to be "defensive," although Emanuel's manner of relating,

social skills, and overall presentation were "adequate." *Id.* at 635. Dr. Damari

described Emanuel's thought process as "coherent and goal directed with no

evidence of hallucinations, delusions, or paranoia." *Id.* Dr. Damari recorded

Emanuel's affect as "tense and irritated" and Emanuel's mood as "dysthymic." *Id.*

at 635–36. Dr. Damari found Emanuel's attention and concentration to be "mildly

impaired" due to emotional distress resulting from a psychiatric disorder. *Id.* at

636. Dr. Damari rated Emanuel's intellectual functioning as "below average." *Id.*

Finally, Damari described Emanuel's insight and judgment as "fair." *Id.* Dr.

Damari's concluding medical source statement was as follows:

> Vocational functional capacities: The claimant is able to
> follow and understand simple directions and instructions.
> She is able to perform simple tasks independently. She is
> able to maintain attention and concentration. The
> claimant is significantly impaired in the ability to
> maintain a regular schedule, learn new tasks, perform
> complex tasks independently, make appropriate decisions,
> relate adequately with others, and appropriately deal
> with stress. The results of the present evaluation appear

> to be consistent with psychiatric problems, and this may
> significantly interfere with the claimant's ability to
> function on a daily basis.

*Id.* at 636–37.

Dr. Damari diagnosed Emanuel with mood disorder, panic disorder, and personality disorder. *Id.* at 637.

### ii. 2013 Consultative Examination by Dr. E. Kamin, PhD

On April 9, 2013, E. Kamin, PhD, a medical/psychiatric consultant, reviewed the medical and non-medical evidence. *Id.* at 156–62. Dr. Kamin determined that Emanuel was not significantly limited in her ability to remember locations and work-like procedures, or in her ability to understand and remember very short and simple instructions. *Id.* at 159. Dr. Kamin found "no evidence of thought disorder" and also that Emanuel was alert and oriented, her memory was intact, and her insight and judgment were fair. *Id.* at 160. However, Dr. Kamin also reported that Emanuel was moderately limited in her ability to understand and remember detailed instructions, to interact with the public, and to respond appropriately to criticism from supervisors. *Id.* at 159. Dr. Kamin opined that Emanuel's attention and concentration were mildly impaired. *Id.* at 160. Dr. Kamin concluded that Emanuel had mild restrictions on daily living, mild difficulties maintaining social functioning, and mild difficulties maintaining concentration, persistence, or pace. *Id.* at 157.

### 3. ALJ Hearing

#### a. Emanuel's Testimony

At the time of her hearing, Emanuel had been living in a homeless shelter for "five or six months." *Id.* at 42. Previously, Emanuel had lived with her mother, but left after an altercation. *Id.* at 43. Emanuel, who is married, was not living with her husband at the time of the hearing. *Id.* He lived with other family members following a heart attack and a stroke. *Id.* at 43–44. Emanuel testified that her husband would live with her at the shelter but for his medical conditions, and that she visited him about two or three times a week. *Id.* at 83, 85.

Emanuel described injuring her neck and back while working as a nurse. *Id.* at 53. Emanuel also described her injuries from two automobile accidents. The first accident, in 2006, injured her shoulder. *Id.* at 69–70. The second accident, in 2012, reinjured her shoulder and injured her neck and back. *Id.* at 70–71. Emanuel claimed that she continued to feel pain in her right shoulder and she could not raise her arm higher than chest level. *Id.* at 76.

In addition to her physical injuries, Emanuel also described her mental health problems. *Id.* at 59. Emanuel claimed that her mental health issues stemmed from a sister's death in 2009. *Id.* at 59, 89–90. Emanuel told the ALJ she began seeing a psychiatrist in 2009 and that she had intermittently been under the care of either a psychiatrist or mental health professional since that time. *Id.* at 59–62. Emanuel saw a psychiatrist first in 2009, although she was not prescribed any medication and did not return. *Id.* at 64. Emanuel next saw a psychiatrist and

a therapist in 2010, when she moved to Georgia, and was prescribed medication. *Id.* at 64–65. Emanuel testified that she did not always take her medication because of its side effects. *Id.* at 63, 66. She explained to the ALJ that the medications left her "in a fog," although without the medicine she felt emotional and would sometimes become angry. *Id.* at 67. Emanuel resumed seeing a psychiatrist after the altercation with her mother that forced her to leave her mother's house. *Id.* at 62.

Regarding her daily activities, Emanuel testified that she visits a relative to bathe and do her laundry. *Id.* at 82–83. Emanuel said that she could "not really" drive: while she could technically drive a car, she could not look behind her because of her neck pain. *Id.* at 78–79. Emanuel also told the ALJ that she gets up every day with her daughter for school. *Id.* at 83. After her daughter leaves for the bus stop, Emanuel returns to bed. *Id.* at 84. Although she is in constant physical pain, when the ALJ asked her about her ability to do daily activities, Emanuel responded, "it's the emotional part that they have a problem with because I get—I don't like people." *Id.* at 88. She claimed that she gets depressed and anxious. *Id.* Emanuel also testified to dramatic weight-loss as a result of "everything." *Id.* at 49–50.

### b. Vocational Expert Linda Stein Testimony

The ALJ then heard from Linda Stein, a vocational expert. *Id.* at 92–98. The ALJ asked Stein to assume a residual functional capacity ("RFC") of:

> sitting six hours out of an eight-hour workday, standing,
> walking six out of eight. Lifting and carrying is limited to
> 20 pounds occasionally, 10 pounds more frequently. No
> upper extremity push [or] pull. No ropes, ladders, or

scaffolds. [Ability to climb] frequent stairs and ramps but no kneeling or crawling. Frequent overhead distance and directional reaching, frequent bilateral manual dexterity, fine and gross manipulation. . . . [S]hould not work around workplace hazards such as unprotected heights and [is] limited to low stress jobs . . . [defined as] jobs requiring only occasional decision making or exercising judgment in connection with job performance with no public interaction, occasional work-related interaction with coworkers.

*Id.* at 94–95. Based on that RFC, Stein testified that Emanuel would not be able to return to any of her previous work. *Id.* at 95. Stein originally testified that Emanuel would be able to find other work, such as an addresser, charge account clerk, or lens inserter. *Id.* Later in her testimony, Stein revised her findings. Stein acknowledged that a limitation on public interaction could prohibit work in the professions she identified; however, Stein testified that work would still be available as a dowel inspector. *Id.* at 96–97.

The ALJ asked Stein to assume an RFC of standing and walking two out of eight hours (instead of six hours) and lifting and carrying 10 pounds (instead of 20 pounds). *Id.* at 96. Stein testified that a claimant with that RFC would also be able to work as a dowel inspector. *Id.* at 97.

The ALJ then asked Stein to assume an RFC that requires "additional time off-task." *Id.* at 97. The ALJ specified this off-task time to mean 20% of the workday and missing two days of work per month. *Id.* Stein testified that there would be no jobs for a claimant with this RFC. *Id.*

## II.    Discussion

### A.    Standard of Review

#### 1.    Judicial Review of Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian,* 708 F.3d at 417 (quoting *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g).

The substantial evidence standard is a "very deferential standard of review."
*Brault v. Soc. Sec. Admin.,* 683 F.3d 443, 448 (2d Cir. 2012).  The reviewing court
"must be careful not to substitute its own judgment for that of the Commissioner,
even if it might justifiably have reached a different result upon a *de novo* review."
*DeJesus v. Astrue,* 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v.
Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations
omitted).  In other words, "once an ALJ finds facts, [a court] can reject those facts
'only if a reasonable factfinder would have to conclude otherwise.'"  *Brault,* 683 F.3d
at 448 (emphasis omitted) (quoting *Warren v. Shalala,* 29 F.3d 1287, 1290 (8th Cir.
1994)).

## 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to
engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death or which
has lasted or can be expected to last for a continuous period of not less than 12
months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  Physical or
mental impairments must be "of such severity that [the claimant] is not only unable
to do his previous work but cannot, considering his age, education, and work
experience, engage in any other kind of substantial gainful work which exists in the
national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet
the statutory definition of disability, the Commissioner "must make a thorough

inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur,* 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.,* 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a.    Five-Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step inquiry. *Cichocki v. Astrue*, 729 F.3d 172, 173 n.1 (2d Cir. 2013); 20 C.F.R. § 404.1520. First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is unemployed, at the second step the Commissioner determines whether the claimant has a "severe" impairment restricting his ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix 1 of Subpart P of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is considered disabled. *Id.*; 20 C.F.R. § 404.1520(d). If not, the Commissioner continues to the fourth step and determines whether the claimant has the RFC to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past

relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work.  20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy.  *See Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir. 2009).

### b.    Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial."  *Sims v. Apfel,* 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding."  *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted).  As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits."  *Sims,* 530 U.S. at 111.  Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history.  *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. §§ 404.1512(d)–(f)).  This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity."  *Pena v. Astrue,* No.

07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue,* No. 09-CV-3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart,* No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel,* 174 F.3d 59 (2d Cir. 1999)). The ALJ must develop the record even where the claimant has legal counsel. *See, e.g.*, *Perez,* 77 F.3d at 47. Remand is appropriate where this duty is not discharged. *See, e.g., Moran,* 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c.    Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue,* No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y.

Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(c), 416.927(d)) (internal quotation marks omitted). A treating physician's opinion is given controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2).

A treating physician's opinion is not always controlling. For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner. *Guzman v. Astrue,* No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). Additionally, where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the

opinion of other medical experts, the treating physician's opinion is not afforded controlling weight." *Pena ex rel. E.R.,* 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original); *see also Snell,* 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian,* 708 F.3d at 420 (quoting *Burgess,* 537 F.3d at 129); *see Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician if clinical findings are inadequate). As a result, "the 'treating physician rule' is inextricably linked to a broader duty to develop the record. Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination." *Lacava v. Astrue,* No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust."), *adopted by,* 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry, the ALJ must consider several factors outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence

in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran,* 362 F.3d at 32 (citation omitted); *see* 20 C.F.R. § 404.1527(c)(2). If, based on these considerations, the ALJ declines to give controlling weight to the treating physician's opinion, the ALJ must nonetheless "comprehensively set forth reasons for the weight" ultimately assigned to the treating source. *Halloran,* 362 F.3d at 33; *accord Snell,* 177 F.3d at 133 (responsibility of determining weight to be afforded does not "exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (referring to *Schaal,* 134 F.3d at 505 and 20 C.F.R. § 404.1527(d)(2)). The regulations require that the SSA "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician. *Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted). Indeed, "[c]ourts have not hesitate[d] to remand [cases] when the Commissioner has not provided good reasons." *Pena ex rel. E.R.,* 2013 WL 1210932, at *15 (quoting *Halloran,* 362 F.3d at 33) (second and third alteration in original) (internal quotation marks omitted).

**B.    ALJ's Decision**

On September 5, 2014, the ALJ issued an unfavorable decision on Emanuel's DIB and SSI claims. R. at 11. At step one, the ALJ found that Emanuel had not engaged in substantial gainful activity since her onset date of March 14, 2012. *Id.* at 16. At step two, the ALJ found three severe impairments: (1) degenerative joint

disease of the shoulders; (2) anxiety; and (3) depression. *Id.* The ALJ noted that, although Emanuel claimed she was also disabled due to a neck injury, "diagnostic test findings were within normal limits." *Id.* The ALJ determined that Emanuel's neck impairments "do not cause more than a minimal limitation in the ability to perform basic work activity and are, therefore, nonsevere." *Id.* at 17.

At step three, the ALJ found that Emanuel's shoulder and mental impairments, either on their own or in combination, did not meet or medically equal the severity of one of the listed impairments in Subpart P, Appendix 1. *Id.* Emanuel does not dispute the ALJ's findings up to this point. Pl. Memo at 6.

The ALJ next turned to Emanuel's RFC, reviewing Emanuel's testimony and the other evidence in the record. The ALJ considered Emanuel's statements about her back and shoulder pain, and about her history of mental health issues. *Id.* at 19. The ALJ also noted that Emanuel moved from Georgia to New York in 2012 and was living in a homeless shelter. *Id.* The ALJ then described Emanuel's daily activities, including getting her daughter up for school, receiving help with household chores and food preparation, and taking trips with her son to visit her husband three times a week. *Id.* The ALJ also described Emanuel's apprehension of being around other people, as well as her prescribed medication and complaints of side effects. *Id.* The ALJ found that Emanuel "has no problems paying attention, following oral or written instructions, or completing tasks." *Id.* (citing Emanuel's Pain Questionnaire and Function Report, *id.* at 339–55).

The ALJ then turned to the medical evidence regarding Emanuel's physical impairments, relying on examinations and treatment by Dr. Barbour, Dr. Dynof, Dr. Dickoff, Dr. Sotudeh, and treatment at Harvey Family Chiropractic. *Id.* at 19–22.

The ALJ next reviewed the evidence regarding Emanuel's mental impairments. *Id.* at 23–26. The ALJ observed that although Emanuel complained of depression, nervousness, and insomnia, her attitude and behavior were cooperative and her affect was appropriate. *Id.* at 23. The ALJ noted Emanuel's assertions that she has no problems paying attention or completing tasks and that she did not report cognitive difficulties. *Id.*

The ALJ also recounted Dr. Damari's description of Emanuel's daily activities, including her ability to bathe, dress, and groom independently, her difficulty managing money, and her apprehension of socializing with others. *Id.* at 24. The ALJ in particular considered that:

> Dr. Damari diagnosed mood disorder, panic disorder with and without agoraphobia, and personality disorder. The doctor stated that [Emanuel] was able to follow and understand simple directions, perform simple tasks independently and maintain attention and concentration. [Emanuel] was significantly impaired in the ability to maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others and appropriately deal with stress.

*Id.* The ALJ assigned "great weight" to Dr. Damari's opinion "because it is based on a complete psychiatric examination and consistent with the record as a whole." *Id.* at 25.

24

The ALJ also cited Dr. Kamin's opinion that Emanuel's concentration is mildly impaired and that Emanuel is able to follow simple instructions and perform simple tasks. *Id.* The ALJ assigned "less weight" to Dr. Kamin's assessment because Dr. Kamin did not treat or examine Emanuel. *Id.* at 25.

Ultimately, the ALJ determined that Emanuel had the residual functional capacity to:

> perform sedentary work . . . except she can never use her upper extremities for pushing and pulling; she can never climb ropes, ladders or scaffolds, kneel, or crawl. She can frequently climb stairs and ramps and frequently reach, and perform bilateral manual dexterity functions including fingering and handling. She should avoid exposure to work place hazards such as moving machines and unprotected heights. She can occasionally make work-related decisions, occasionally exercise judgment in job performance and occasionally be in contact with supervisors and co-workers. She can never be in contact with the general public.

*Id.* at 18.

At step four, based on the above RFC, the ALJ found that Emanuel could not perform any of her previous work. *Id.* at 26. At step five, the ALJ determined that there were other jobs that Emanuel could perform, such as addresser or lens inserter. *Id.* at 26–27.[8] Accordingly, the ALJ concluded that Emanuel was not

---

[8] Although Emanuel does not raise the issue, the ALJ erred in finding that Emanuel would be able to work as an addresser or lens inserter. *Id.* at 27. The evidence does not support this finding. In fact, as discussed *supra* in section I.B.3.b., while the vocational expert originally suggested these jobs, she later revised her testimony to reflect the limitation of no public interaction. *Id.* at 95–96. However, she testified that other jobs, such as dowel inspector, would not require public interaction and were available. *Id.* at 97.

disabled within the meaning of the Social Security Act and denied her claim. *Id.* at 27.

## C.  Analysis

Emanuel raises only one issue as the basis for her motion: the ALJ's "fail[ure] to account" for consultative examiner Dr. Damari's opinion in determining Emanuel's mental limitations as a part of her RFC. Pl. Memo at 6. Specifically, Emanuel argues that, even though the ALJ assigned Dr. Damari's opinion "great weight," the ALJ did not take into account Dr. Damari's opinion about Emanuel's mental impairments, and that the ALJ should have, at the very least, explained the exclusion of some of the impairments found by Dr. Damari. *Id.*[9] The Commissioner responds that the ALJ's RFC determination is supported by substantial evidence and that Emanuel is, in essence, incorrectly asking the Court to find that an ALJ must give a consultative examiner's opinion controlling weight. Def. Memo at 20–21.

Because Emanuel is represented by counsel and only challenges the Commissioner's determination on the grounds that the ALJ's mental limitations findings (made in the course of determining Emanuel's RFC) did not properly account for Dr. Damari's opinion, the Court will focus solely on the ALJ's mental limitation findings. *See, e.g., Prince v. Colvin*, No. 13-CV-7666 (TPG), 2015 WL

---

[9] Emanuel does not dispute that Dr. Damari was a consultative examiner, rather than a treating physician whose opinion would ordinarily be entitled to controlling weight. Pl. Memo at 6 (referring to Dr. Damari as "the Agency's examining psychological expert").

1408411, at *15 (S.D.N.Y. Mar. 27, 2015) (analyzing only ALJ's RFC determination, which claimant had challenged, and not ALJ's adverse findings as to severity of impairments, on grounds that claimant was counseled and did not challenge those severity findings).

For the reasons that follow, the Court concludes that the ALJ's mental limitations findings are supported by substantial evidence and accordingly rejects Emanuel's argument that the ALJ is required to accept (or explain any deviations from) the entirety of Dr. Damari's opinion.

### 1. The ALJ's findings regarding Emanuel's mental limitations are supported by substantial evidence

Emanuel argues that "Dr. Damari's opinion establishes numerous limitations that are greater and more detailed than found by the ALJ." Pl. Memo at 16. In particular, Emanuel alleges that the ALJ did not account for Dr. Damari's opinion that Emanuel was significantly impaired in her ability to: (a) maintain a regular schedule; (b) learn new tasks; (c) perform complex tasks independently; (d) make appropriate decisions; (e) relate adequately to others; and (f) deal with stress appropriately. *Id.* at 9–10; *see also* R. at 636–37. Emanuel contends that these limitations "would severely limit the jobs available to a person, if not preclude work altogether." Pl. Memo at 10. The Commissioner responds that the ALJ's findings regarding Emanuel's mental limitations are supported by substantial evidence. Def. Memo at 20. Furthermore, the Commissioner contends that, notwithstanding that the ALJ's findings are supported by substantial evidence, the ALJ accounted for Dr. Damari's opinion in his decision. *Id.* at 22.

This Court reviews whether the ALJ's limitations findings are supported by substantial evidence, meaning "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian,* 708 F.3d at 417 (quoting *Richardson,* 402 U.S. at 401) (internal quotation marks and alterations omitted). However, an ALJ need not have "mentioned every item of testimony presented to him." *Mongeur,* 722 F.2d at 1040. Even if the ALJ does not explicitly discuss every piece of evidence, a court may affirm the ALJ's decision if "the evidence of record permits [the court] to glean the rationale of [the] ALJ's decision." *Id.*; *see also, e.g.*, *Cichocki*, 729 F.3d at 178 n.3 ("in undertaking the . . . residual capacity assessment," "[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record permits [the court] to glean the rationale of an ALJ's decision") (quotation marks omitted).

In concluding that the ALJ's decision was supported by substantial evidence, the Court will consider in turn each of the ALJ's mental limitation findings (or lack thereof) that corresponds to the impairments identified by Dr. Damari. While certain of these impairments are not explicitly included in the ALJ's RFC determination, many of the limitations found by the ALJ are in fact consistent with the impairments found by Dr. Damari. More significantly, each finding the ALJ made with regard to a limitation (including where he chose not to impose one) is supported by medical evidence, Emanuel's testimony, or both.

### a. Maintaining a Regular Schedule

The ALJ's RFC determination does not contain any limitation regarding Emanuel's ability to maintain a regular schedule.  R. at 26.  Dr. Damari found that Emanuel was significantly impaired in her ability to maintain a regular schedule, *id.* at 637, a finding that the ALJ noted in his decision.  *Id.* at 24.[10]  However, substantial evidence in the record supports the ALJ's finding that Emanuel was not limited in her ability to maintain a regular schedule.

At the hearing, Emanuel testified to "always" waking up in the morning with her daughter.  *Id.* at 83.  Emanuel also testified to visiting her husband, who lives 45 minutes away, two or three times weekly.  *Id.* at 85.  The ALJ refers to both pieces of testimony in his opinion.  *Id.* at 25–26.  Furthermore, Emanuel claimed that she left her last job because of an on-the-job injury, and did not allege any problems maintaining a regular schedule.  *Id.* at 52; 37–99.  The ALJ is entitled to credit a claimant's testimony, even if it conflicts with a medical source.  *See, e.g., Salmini v. Comm'r of Soc. Sec.,* 371 Fed. App'x 109, 114 (2d Cir. 2010).

In addition to her testimony, the evidence in the record also supports a finding that Emanuel is able to maintain a regular schedule.  At her initial assessment at WJCS, Dingee rated Emanuel's ability to manage time (defined as "[f]ollows regular schedule for bedtime, wake-up, meal times, rarely tardy or absent for work, day programs, appointments, scheduled activities") as four on a scale of

---

[10] Dr. Damari's four-page evaluation does not contain any evidence providing a basis for her opinion that Emanuel is impaired in her ability to maintain a regular schedule.  *Id.* at 634–37.

seven.  R. at 783.  Moreover, Emanuel's healthcare record illustrates her ability to frequently attend follow-up medical appointments.  For example, Emanuel attended chiropractic appointments as often as eight times a month in 2013.  *Id*. at 726, 732–44, 750–66, 772–73.  She also attended regularly scheduled appointments with her therapist at WJCS in 2014.  *Id.* at 777–98.

### b.  Learning New Tasks

The ALJ's RFC determination does not contain any limitation regarding Emanuel's ability to learn new tasks.  *Id.* at 26.  The ALJ noted Dr. Damari's opinion that Emanuel was significantly impaired in her ability to learn new tasks.  *Id*. at 24; *see also id*. at 637.  While the ALJ's finding contradicts Dr. Damari's opinion, it is supported by substantial evidence, including evidence referred to by the ALJ demonstrating Emanuel's ability to think, concentrate, and learn.

Dr. Damari opined that Emanuel could follow and understand simple direction and instructions, and maintain attention and concentration.  *Id.* at 636–37.  Dr. Kamin concluded that there was no evidence of thought disorder and that, while Emanuel's attention and concentration were "mildly impaired," her memory was intact and her intelligence was average.  *Id.* at 176.  Dr. Kamin also found no "sustained concentration and persistence limitations," and that Emanuel was "not significantly limited" in her ability to remember locations and work-like procedures.  *Id.* at 175.  In his RFC determination, the ALJ specifically refers to Dr. Kamin's assessment that Emanuel had only "mild" difficulties in maintaining concentration.  *Id.* at 25.

The ALJ also discusses evidence from Emanuel's treatment at Andrus and WJCS. He cites Diaz's intake assessment from Andrus, including Diaz's observation that Emanuel had fair memory skills and normal concentration and attention. *Id.* at 24; *see also id.* at 684–85. Diaz also found that Emanuel had average intellectual functioning and had a coherent thought process. *Id.* at 684. The ALJ describes Dr. Balint's opinion that Emanuel's thought process was "focused" and her memory, attention, and concentration "intact." *Id.* at 25; *see also id.* at 789. The ALJ also refers to Emanuel's ability to read, write, and count change, which she testified to at her hearing. *Id.* at 26; *see also id.* at 50 (Emanuel's testimony). Additionally, Dingee described Emanuel's intellect as "normal." *Id.* at 782. Dr. Subramanian reported that Emanuel had a "logical" thought process and was of "average" intelligence. *Id.* at 614.

### c. Performing Simple Tasks

The ALJ's RFC determination limits Emanuel to simple tasks with one or two-step instructions. *Id.* at 26. This limitation is consistent with Dr. Damari's opinion and supported by substantial evidence. Dr. Damari opined that Emanuel was significantly impaired in her ability to perform complex tasks, but could "perform simple tasks independently," as well as follow and understand simple directions and instructions. *Id.* at 636–37. Dr. Damari's notes reflect that Emanuel could dress, bathe, and groom herself. *Id.* at 636.

The ALJ's finding is supported by additional evidence in the record. Dr. Kamin opined that Emanuel was moderately limited in her ability to understand

and remember detailed instructions, but was not significantly limited in her ability to understand and remember very short and simple instructions. *Id.* at 175. The ALJ's finding is also supported by Emanuel's own testimony about performing simple daily activities, such as dressing herself, driving, and caring for her daughter. *Id.* at 78, 83.

### d. Occasionally Making Work-related Decisions

The ALJ's RFC determination limits Emanuel to only "occasionally mak[ing] work-related decisions." *Id.* at 26. This limitation is consistent with Dr. Damari's opinion and supported by substantial evidence. Dr. Damari opined that Emanuel was significantly impaired in her ability to make appropriate decisions, but also that Emanuel's insight and judgment were "fair." *Id.* at 636–37. Dr. Kamin concluded that Emanuel's judgment and insight were "fair." *Id.* at 176. Dr. Balint found that Emanuel had "limited," as opposed to "poor," insight and judgment, *id.* at 789, a finding that the ALJ referred to in his decision. *Id.* at 25.

Furthermore, in addition to the evidence demonstrating that Emanuel is not impaired in her cognitive abilities, *see supra* II.C.1.b, there is also evidence that Emanuel is not impaired in her perception. At her intake assessment at Andrus, Diaz found that Emanuel had "normal" perceptions and no hallucinations or delusions. *Id.* at 685. Diaz described Emanuel as oriented and alert. *Id.* at 684. Dr. Balint similarly found that Emanuel had "intact" orientation and had no hallucinations or delusions. *Id.* at 789.

### e. Having No Contact with Public and Occasional Contact with Supervisors and Co-workers

The ALJ concluded that Emanuel was so limited in her ability to relate to others that she could "never be in contact with the general public" and could only "occasionally be in contact with supervisors and co-workers." *Id.* at 26. The ALJ's RFC determination is supported by substantial evidence and, furthermore, is consistent with Dr. Damari's opinion. Dr. Damari opined that Emanuel was significantly impaired in her ability to relate adequately to others. *Id.* at 637. Emanuel testified that she has problems with other people, such as at the grocery store and at the shelter where she lived, and also that she does not like crowds. *Id.* at 68–69. Dr. Kamin opined that Emanuel was moderately limited in her ability to interact with the general public. *Id.* at 159.

### f. Low Stress Jobs

Finally, Dr. Damari found that Emanuel was significantly limited in her ability to deal appropriately with stress. *Id.* at 637. Although the ALJ does not explicitly discuss a low-stress limitation in his decision, the record establishes that this impairment is incorporated into the other limitations. At the hearing, the ALJ specifically instructed the vocational expert to consider a hypothetical claimant "limited to low stress jobs[,] which is defined for the purposes of this RFC as jobs requiring only occasional decision making or exercising judgment in connection with job performance with no public interaction, occasional work-related interaction with coworkers." *Id.* at 95. Each of these limitations is incorporated in the ALJ's RFC,

*id.* at 18, and the ALJ's instruction to the vocational expert is supported by substantial evidence.

In addition to Dr. Damari's opinion, *id.* at 637, Dr. Kamin found that Emanuel was "moderately limited" in her ability to respond appropriately to changes in work setting. *Id.* at 175–76. Diaz describes Emanuel as "irritable and short fused at times." *Id.* at 685. Dr. Subramanian describes Emanuel's demeanor as "hostile" and "preoccupied." *Id.* at 613. Dingee rated Emanuel's health practices, which include mood management, as a three out of seven. *Id.* at 783. Progress notes from Dingee discuss managing violent and aggressive behavior. *Id.* at 794–98. Dr. Balint also noted Emanuel's struggles with "anxiety." *Id.* at 789.

## 2. An ALJ Need Not Accept or Explain the Exclusion of Every Impairment Identified by a Consultative Examiner

Emanuel argues that the ALJ is required to either "Accept and Include or Reject and Explain" medical opinions. Pl. Memo at 9. However, the law of this Circuit is that an ALJ is not required to discuss, or even mention, every piece of evidence in the record and its relative persuasiveness. *See, e.g.*, *Mongeur,* 722 F.2d at 1040. Where "other portions of the ALJ's detailed decision, along with plaintiff's own testimony, demonstrate that substantial evidence supports [the] ALJ's determination," remand is not appropriate. *Salmini,* 371 Fed. App'x at 112–13. As the above analysis demonstrates, the ALJ refers to substantial evidence that supports his determination not to include wholesale all of Dr. Damari's opinions about Emanuel's impairments. The portion of the ALJ's decision that is dedicated to his RFC determination is comprised of more than seven single-spaced pages of

discussion of evidence in the record, and includes analyses of evidence from Dr. Damari, Dr. Balint, and Dr. Kamin, as well as of the treatment notes from Andrus and WJCS. *Id.* at 18–26. As in *Salmini,* the claimant's testimony also provides evidence that supports the ALJ's finding. *Salmini,* 371 Fed. App'x at 112; R. at 78–79, 85.

Emanuel cites to *Schisler v. Sullivan,* 3 F.3d 563 (2d Cir. 1993) and *Diaz v. Shalala,* 59 F.3d 307 (2d Cir. 1995) in support of her assertion that an ALJ must "give good reasons for departing from the assessments of experts." Pl. Memo at 9. However, as the Commissioner correctly points out, these cases deal with instances in which an ALJ declined to give controlling weight to a treating source. Def. Memo at 23. *Schisler* examined the validity of 20 C.F.R. § 404.1527, which states: "[The SSA] will always give good reasons in [their] notice of determination or decision for the weight [they] give [a claimant's] *treating source's* medical opinion." *Schisler,* 3 F.3d at Appendix A (emphasis added). In *Diaz,* the main issue was whether a chiropractor's opinion was entitled to "binding effect under the treating physician rule." *Diaz,* 59 F.3d at 312. Because Dr. Damari was a consultative examiner and not a treating physician, these cases are inapposite.

\*\*\*

In sum, the ALJ's findings regarding Emanuel's mental limitations are supported by substantial evidence, and the ALJ's references to the record permit the Court to glean the rationale in support of his findings. Furthermore, Emanuel's

argument that an ALJ must either accept a consultative examiner's opinion or explain any deviations therefrom is without merit.

## III. Conclusion

For the foregoing reasons, Emanuel's motion for judgment on the pleadings is denied and the Commissioner's cross-motion is granted.

The Clerk is directed to terminate Docket Number 15, deny the motion at Docket Number 17, grant the motion at Docket Number 23, and enter judgment for the Commissioner.

**SO ORDERED.**

Dated:  New York, New York
     December 4, 2017

_____
JAMES L. COTT
United States Magistrate Judge